Affirmed and Memorandum Opinion filed June 28, 2011.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-10-00222-CR

___________________

 

William solomon Lewis, Appellant

 

V.

 

The State of Texas, Appellee



 



 

On
Appeal from the 184th District Court

Harris County,
Texas



Trial Court Cause No. 1219699

 



 

 

MEMORANDUM OPINION

            A jury convicted William Lewis of retaliation and
sentenced him to three years’ imprisonment.  On appeal, Lewis argues that the
evidence was legally and factually insufficient to support his conviction, and the
trial court erred by sustaining the State’s objection to evidence about a civil
lawsuit.  We affirm.

I

            Around one o’clock in the morning of April
12, 2007, Nurse Kim Yenn was on duty in the neonatal department of Texas
Woman’s Hospital and saw William Lewis walking around the hallway holding a
newborn baby.[1] 
Hospital policy demands that all infants be in cribs while in the hallway for
their safety, so another staff member told Lewis he could not continue carrying
the baby there.  Lewis replied “I can do to my baby what I like,” in what Nurse
Yenn described as a hostile tone before he returned to the baby’s room.  A few
minutes later, Lewis carried the baby into the hallway again, covering her head
with something resembling a car seat.  He walked toward the elevators, but Nurse
Yenn did not feel comfortable objecting due to his initial hostility.  Instead,
she called security and another staff member called their supervisor, Nurse
Melissa Tschoertner.  A “code gray” was called, indicating that someone was
making a disturbance and causing possible problems for or harm to a patient or
personnel.

            Nurse
Tschoertner took the elevator to the fourth floor.  When the doors opened,
Lewis entered the elevator “hollering.”  However, the baby had a security
device attached to a clamp on her umbilical cord, and when Lewis tried to take her
from the neonatal floor, the device activated an alarm and shut down all the
exits and elevators.  When Nurse Tschoertner asked Lewis why he was upset, he
shoved her aside and demanded she “make this elevator work.”   He asserted he
was willing to hurt someone or start a hostage situation if he was not left
alone.  Nurse Tschoertner explained that it was not possible for him to leave
with the baby at that time and continued asking him what was wrong, but Lewis
refused to answer.  He continually waved the infant around with his right hand
while threatening and yelling at the nurses.  When Jacqueline Gray, the baby’s
mother, came into the hallway, Lewis was confrontational toward her as well.

            Deputy
John Flores of the Harris County Sheriff’s Department was working at Texas
Woman’s Hospital that morning and received a disturbance call about a man on
the fourth floor trying to take a baby from the hospital.  He immediately
reported to the fourth floor and heard Lewis shouting, “You can’t stop me, this
is my baby.”  When Lewis saw Deputy Flores, Lewis “bold[ed] up” to him and said,
“Come on, you want some of this?”  Deputy Flores testified Lewis was hostile,
aggressive, and agitated.  Lewis then walked in the direction of the elevators,
but Deputy Flores told Lewis he was not going anywhere.  Lewis refused to
listen to or cooperate with Deputy Flores, leading Deputy Flores to conclude
that Lewis was not going to calm down anytime soon.  

Officer D. Boling of the
Houston Police Department, who was also working at Texas Woman’s Hospital that
morning, received a call over the hospital radio about a possible infant
abduction.  He used his badge to unlock the elevators and arrived at the fourth
floor soon after Deputy Flores.  As he ran toward Lewis, Officer Boling passed
Gray and heard her say, “He’s taking my baby, he’s taking my baby.”  Lewis saw
Officer Boling and continued threatening to start a hostage situation and
repeatedly asserting, “I could take you,” and “Do you want some of this?”  Officer
Boling described Lewis’s manner as aggressive, agitated, and ready and willing
to fight.  Deputy Flores and Officer Boling feared for their own safety as well
as that of the infant, which Lewis continued to swing around.  Lewis said he
was “done talking.”  Officer Boling, apprehensive of a possible physical
confrontation with Lewis while Lewis held the infant, believed shooting him
with a Taser was the only way to control the situation.[2]  Officer Boling
whispered his plan to Deputy Flores so Deputy Flores could prepare to catch the
infant.  When Lewis turned such that his body blocked the baby from the Taser’s
potential path, Officer Boling shot Lewis with the device.  Lewis fell to his
knees and dropped the baby about two feet to the floor.  Deputy Flores
retrieved the baby almost immediately and gave her to Gray.  Nurse Tschoertner
quickly took the infant from Gray to a security-coded nursery on the other end
of the hospital for a medical evaluation.  The on-call neonatologist confirmed
the baby sustained no injuries as a result of the fall.

Officer Boling
handcuffed Lewis with Deputy Flores’s help, and they escorted Lewis to the
security office.  Lewis quickly recommenced yelling, saying they had “fucked
up,” “this is not over,” and that he was going to “come after” them.  The Taser
caused Lewis to urinate himself, which increased his anger toward Officer
Boling.  Lewis looked Officer Boling in the face and said, “Look at my face. 
This is not over.  You are going to see me again.  I’m going to get you,” and
“I’m going to dedicate the rest of my life to getting you.”  Officer Boling and
Deputy Flores believed these were real, serious threats of physical harm.  They
described Lewis as very angry, hostile, and upset, especially at Officer
Boling, and Lewis repeated these threats for approximately forty minutes.  Lewis
did not, however, threaten to go to the media or sue Officer Boling.[3] 

Officer Boling made
several phone calls during that forty-minute time: he called the paramedics to
check on Lewis and remove the Taser darts, the district attorney’s office to
bring charges against Lewis, and a transport unit to take Lewis to jail.  Later
that day, Officer Eddie Rodriguez, an investigator for the Criminal
Intelligence Division (CID) of the Houston Police Department, interviewed
Lewis, and Lewis claimed his civil rights had been violated and he was going to
go the media.

Lewis was indicted on a
charge of retaliation.  The case was tried to a jury wherein Lewis was
convicted and sentenced to three years’ imprisonment.  Lewis then filed this
timely appeal.

II

A

            Lewis’s first and second issues are that
the evidence against him is legally and factually insufficient, respectively, because
the statements in question were a matter of subjective interpretation and thus
“too weak” to support the guilty verdict beyond a reasonable doubt.  The thrust
of Lewis’s argument is that if he threatened anything, it was to complain to
the media about how Officer Boling and Deputy Flores treated him, or to report
them to “internal affairs,” or to sue them.  Lewis maintains that there is no
evidence that he ever made a specific threat of physical harm.

1

            A majority of the judges on the Court of
Criminal has Appeals concluded that the Jackson v. Virginia
legal-sufficiency standard is the only standard a court reviewing a criminal
case should apply in determining whether the evidence is sufficient to support
each element that the State is required to prove beyond a reasonable doubt.  Brooks
v. State, 323 S.W.3d 893 (Tex. Crim. App. 2010) (plurality op.) (Hervey,
J., joined by Keller, P.J., Keasler, and Cochran, J.J.); id. at 926
(Cochran, J., concurring, joined by Womack, J.) (agreeing with the plurality
conclusion).  Accordingly, we will analyze Lewis’s legal- and
factual-sufficiency issues under the Jackson v. Virginia standard and
ask only if the evidence against him was legally sufficient to sustain a
verdict of guilty beyond a reasonable doubt.  See id. at 912 (plurality
op.); see also Pomier v. State, 326 S.W.3d 373, 378 (Tex. App.—Houston
[14th Dist.] 2010, no pet.).

            In a
legal-sufficiency review, we examine all the evidence in the light most
favorable to the verdict to determine whether a rational trier of fact could
have found the essential elements of the offense beyond a reasonable doubt.  Jackson
v. Virginia, 443 U.S. 307, 319 (1979).  This standard of review applies to
cases involving both direct and circumstantial evidence.  Clayton v. State,
235 S.W.3d 772, 778 (Tex. Crim. App. 2007).  Although we consider everything
presented at trial, we do not substitute our judgment regarding the weight and
credibility of the evidence for that of the fact finder.  Williams v. State,
235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  We presume the jury resolved
conflicting inferences in favor of the verdict, and defer to that
determination.  Clayton, 235 S.W.3d at 778.  We also determine whether
the necessary inferences are reasonable based upon the combined and cumulative
force of all the evidence when viewed in the light most favorable to the
verdict.  Id.  

2

            A
person commits a third-degree felony if he (1) intentionally or knowingly (2)
harms or threatens to harm another (3) by an unlawful act (4) in retaliation
for or on account of the service status of another (5) as a public servant. 
Tex. Penal Code § 36.06(a)(1)(A).  The elements do not require the person
intend to carry out the threat or take any affirmative steps to do so.  Lebleu
v. State, 192 S.W.3d 205, 209 (Tex. App.—Houston [14th Dist.] 2006, pet.
ref’d).  

            To
meet its burden, the State adduced evidence that Lewis made numerous and
repeated verbal threats to Officer Boling.  Officer Boling testified that
Lewis’s first words to him were “Do you want some of this.”  Without more, it
is difficult to see how that statement could be interpreted as a threat of
going to the media or of future civil litigation, particularly given the
testimonies of Nurse Yenn, Nurse Tschoertner, Deputy Flores, and Officer Boling,
which consistently described Lewis’s manner as very agitated, aggressive,
upset, and hostile.  Officer Boling and Nurse Tschoertner both testified that
Lewis threatened to create a hostage situation if he were not permitted to
leave and told Officer Boling, “I could take you.”  After Officer Boling subdued
Lewis with the Taser, Lewis said, “Look at my face.  This is not over.  You are
going to see me again.  I’m going to get you,” and “I’m going to dedicate the
rest of my life to getting you.”  Deputy Flores testified that Lewis said he
was going to “come after” the officers and that if Deputy Flores took off
Lewis’s handcuffs, Lewis would “show” him, strongly suggesting a threat of a
physical nature.  Nurse Tschoertner testified Lewis said, “I’m going to get off
of—off of this floor.  If I have to take hostages or if I have to hurt someone,
I’m going to leave with my child,” and that he would fight people if necessary. 
The jury had before it the undisputed testimony that Lewis repeatedly made
these comments.  Therefore, the combined and cumulative force of the evidence
when viewed in the light most favorable to the verdict is such that the jury
could have reasonably interpreted these threats to be of physical violence and
not of going to the media or of future civil litigation.  See Clayton,
235 S.W.3d at 778.

            The
State also had to prove Lewis made the threats in retaliation for Officer Boling’s
service as a public servant, namely a police officer.  To prove these elements,
the State produced evidence that Lewis made the threats because of Officer Boling’s
role in stopping Lewis from leaving with the baby, arresting him, and
especially shooting Lewis with the Taser, which caused Lewis to drop the baby
and urinate himself.  Officer Boling’s role as a police officer made it his duty
to resolve the situation, and he testified that, based on Lewis’s conduct and assertions
that he was “done talking,” Officer Boling believed he had no choice but to use
his Taser.  Because of Lewis’s escalating anger regarding Officer Boling’s
refusal to let him leave the hospital, Lewis repeatedly threatened Officer Boling,
and several witnesses testified to understanding the threats to refer to
physical harm.  Officer Boling would not have become involved in the situation
but for his role as a public servant.  Thus, a reasonable jury could have
concluded that Lewis uttered his threats in retaliation for Officer Boling’s
role and service as a police officer.  See, e.g., Lebleu, 192
S.W.3d at 209 (concluding threats against a judge were because of the judge’s
service as a public servant when appellant’s threats were an outgrowth of
extreme dissatisfaction with the judge’s rulings and the judge presided over the
matter because of his role as a public servant).  The State’s evidence was
legally sufficient for each element of retaliation.  See Jackson, 443
U.S. at 319.

B

            In his third issue, Lewis contends the
trial court erred by sustaining the State’s objection to evidence about a civil
lawsuit stemming from the same incident because the excluded testimony was a
key piece of evidence for Lewis’s defense.  The State argues Lewis failed to
preserve the error for this appeal and, alternatively, that the excluded
testimony was neither relevant nor necessary to prove his defense.  The defense
adduced the testimony at issue during cross-examination of Deputy Flores:

Q:  Now, Deputy, I want to
talk to you about kind of the aftermath of this.  
    This was a pretty big event at the hospital; is that fair?
A:  Yes, sir.
Q:  Do you recall this making the news within the next few days afterwards?
A:  Yes, sir.
Q:  You remember seeing Ms. Gray and Mr. Lewis on separate occasions on  
     the news?
A:  On the news?
Q:  Yes.
A:  Maybe later. 
Q:  And you knew, of course, that there were threats of litigation against the 
     hospital and against you guys?
[The State]:  Objection, relevance.
The Court:  Sustained.
[Defense Counsel]:  I’ll pass the witness, Judge.

Error
may not be predicated upon a ruling that excludes evidence unless a substantial
right of the party is affected and the substance of the evidence was made known
to the court by offer or was apparent from the context within which questions
were asked.  Tex. R. Evid. 103(a)(2).  An offer of proof may be in
question-and-answer form, or it may be in the form of a concise statement by
counsel.  Warner v. State, 969 S.W.2d 1, 2 (Tex. Crim. App. 1998).  A
concise statement for this purpose must include a reasonably specific summary
of the evidence offered and must state the relevance of the evidence unless the
relevance is apparent, so that the court can determine whether the evidence is
relevant and admissible.  Id. (citing Love v. State, 861 S.W.2d
899, 901 (Tex. Crim. App. 1993)).  An informal bill will suffice as an offer of
proof when it includes a concise statement of counsel’s belief of what the
testimony would show.  Love, 861 S.W.2d at 901.  

1

Lewis’s
counsel made no attempt to explain the substance of the excluded testimony, nor
was it apparent from the context of the other questions being asked.   Lewis
contends his threat of civil litigation in the media is crucial to his defense
given his reliance on the premise that he intended to threaten Officer Boling
only with going to the media and pursuing civil litigation and not with causing
physical harm.  Although it may have been apparent that he sought to introduce
the statements themselves to support that proposition, it was not similarly
apparent why Lewis sought to introduce Deputy Flores’s knowledge, or lack
thereof, of those statements.  Lewis further argues that the excluded testimony
was relevant because the deputy’s knowledge of the threats may reflect a bias,
interest, and prejudice of which the jurors should have been aware.  But,
although the trial court could have found this rationale persuasive in ruling
on the objection, it was not apparent from the question’s context.

             Because
the substance of the excluded testimony was not apparent from the
circumstances, Lewis needed to provide an offer of proof to preserve the error. 
See Warner, 969 S.W.2d at 2.  He failed to do so.  In fact, his counsel
offered no response to the trial court’s ruling and passed the witness without
further discussion.  Any potential error was not preserved and we overrule
Lewis’s third issue.

2

            Assuming arguendo that Lewis had
preserved the error for appeal, we would review the trial court’s ruling on the
admissibility of evidence under an abuse-of-discretion standard.  Willover
v. State, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).  Under this standard, an
appellate court must uphold the trial court’s ruling if it is within the zone
of reasonable disagreement and is correct under any theory of law applicable in
the case.  Id.; Green v. State, 934 S.W.2d 92, 101–02 (Tex. Crim.
App. 1996).

Relevance is broadly
defined as “evidence having any tendency to make the existence of any fact that
is of consequence to the determination of the action more probable or less
probable than it would be without the evidence.”  Tex. R. Evid. 401. 
Accordingly, Lewis actually threatening civil litigation in the media may have
some tendency to make it more probable that Lewis was also threatening to sue during
the incident than it would be without that evidence.  However, whether Deputy
Flores knew Lewis made such statements in the media is a separate matter
and does not have the same consequence.  Further, Deputy Flores’s testimony was
not the only means through which Lewis could have communicated to the jury that
he threatened civil litigation in the media.  In fact, the defense counsel called
Officer Rodriguez to the stand and asked him about Lewis’s statements of
intentions to sue but, upon the State’s objection and the court’s ruling that
proceeding with that line of questioning would open the door for other
extraneous offenses, the defense counsel opted to pass the witness.

            We
cannot say that the trial court’s ruling was outside the zone of reasonable
disagreement.  Green, 934 S.W.2d at 101–02.  Although the fact that Lewis
made statements to the media may itself enhance the likelihood that Lewis’s
threats to Officer Boling reflected his intentions to sue, Deputy Flores’s
knowledge of those statements does not.  Without guidance from Lewis’s counsel
explaining an alternate purpose, the ruling was clearly within the trial
court’s discretion.  See Willover, 70 S.W.3d at 847.

* * *

For
the foregoing reasons, we affirm the trial court’s judgment.

                                                                                    

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

 

 

Panel consists of Justices
Anderson, Brown, and Christopher.

Do
Not Publish — Tex. R. App. P. 47.2(b).









[1] The record does not
specifically indicate the baby’s sex, but during Officer D. Boling’s testimony
he and the State’s counsel both consistently refer to the baby as a female. 
Accordingly, we will refer to the baby as a female for the sake of clarity.





[2] Officer Boling testified
that his training taught him that the electric current would not pass from
Lewis to the baby.





[3] At trial, Deputy Flores
was unable to remember whether Lewis mentioned going to the media or pursuing
future civil litigation against him.